**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| **JIREH CONSTRUCTION COMPANY, INC.**<br><br>**Plaintiff,**<br>**v.**<br>**VIRGINIA DEPARTMENT OF TRANSPORTATION, and STEPHEN BRICH in his official capacity.**<br><br>**Defendants.** | **Case No.** 3:26-cv-1387<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, JIREH Construction Company, Inc. (hereinafter "Jireh" or "Plaintiff"), by and through its attorneys, Amina Matheny-Willard, PLLC, for its Complaint against Defendants, aver as follows:

1. Plaintiff is a Black-owned business that is the life's work of Willie Lee ("Mr. Lee"), the sole shareholder and founder of Jireh. Jireh and its owner have "done everything right." He kept his head down, he worked hard, he stayed quiet—Mr. Lee even served his country.

2. The life of Mr. Lee resembles in certain ways a Horatio Alger novel: Mr. Lee grew up during the struggle for civil rights in the South, struggled, hustled, and sweated his way to success, and now he owns a respectable construction business.

3. Unfortunately, the deck remains stacked against Mr. Lee and his business, the Plaintiff in this action.

4. Plaintiff acts as a primary contractor, bidding on construction projects for various municipal, county, and state projects; during that bidding process, often run via the Virginia Department of Transportation ("VDOT"), Plaintiff is regularly discriminated against based on an imputed perceived race.

5. Specifically, it is treated differently in the bidding process where the opacity of the process allows for VDOT to attempt to conceal what amounts to commercial bigotry—VDOT regularly awards contracts to white-owned businesses where those white-owned businesses bid well over the construction value[1] of the projects at issue, while refusing to award contracts to Plaintiff where Plaintiff's bid is slightly above the construction value.

## JURISDICTION

6. Plaintiff's claims arise under 42 U.S.C. § 2000d such that the jurisdiction of this Court is proper pursuant to 28 U.S.C.A. §§ 1331 and 1343.

## VENUE

7. Venue is proper in this district under 28 U.S.C. § 1391(b)(1) & (2), because Defendants are residents of the Eastern District of Virginia and a substantial portion of the events giving rise to this claim occurred within the Eastern District.

## PARTIES

8. Defendant VDOT is a governmental entity and a department of the Commonwealth of Virginia.

9. VDOT is headed by a Commissioner, Stephen Brich ("Mr. Brich"). Who is ultimately responsible for the contracting and bidding process at VDOT.

10. VDOT, on information and belief "resides" within the District under 28 U.S.C. § 1391(c)(2).

[1] In the Commonwealth these projects all involve internal "Engineers Estimates" of project construction value. The Commonwealth announces not only what the bids were but likewise whether the lowest bid exceeded or did not exceed the construction value internally determined by the Commonwealth's engineers, the "Engineers Estimate." Bids which exceed 7% of the construction value estimated by the commonwealth's engineers require written explanation for approval, as do those which fall suspiciously below the nearest bid and/or the construction value calculated by the Commonwealth.

11. VDOT receives significant federal funding under any number of programs.

12. That funding benefits the populace of Virginia at large and those who travel within and through the Commonwealth, but likewise benefits contractors who construct and maintain Virginia's roadways, sidewalks, highways, and infrastructure.

13. Mr. Brich at all times relevant was the Commissioner of Highways.

14. On information and belief Mr. Brich resides in the District.

15. Mr. Brich, as Commissioner, heads not only VDOT's bidding process but likewise is responsible for approving bids and ultimately signing off on awards and signing ultimate funding documents.

16. A bid is only officially awarded once the Commissioner approves of the bid and signs the award.[2]

17. Plaintiff is solely owned by Black shareholders—indeed, the business is wholly owned by Mr. Lee who is black.

18. Mr. Lee is the public face of the business; he runs operations, while his wife Juanita (also black) manages the back office. The entirety of the management of Plaintiff is black.

19. Plaintiff, acting through Mr. Lee, has registered with the Commonwealth as a "Disadvantaged Business Enterprise" ("DBE"). Plaintiff qualified as a DBE because it is 100% owned by Mr. Lee, who as noted above is black.

20. Plaintiff participated in programs which were dependent on its "racial status" including the Business Opportunity and Workforce Development ("BOWD").

[2] The process does vary slightly depending on the value of the contract, with contracts over 5 million dollars going through a slightly more involved process.

21. Mr. Lee participated in the first BOWD program and out of the 22 student-participants was awarded the "most likely to succeed."

22. Mr. Lee has struggled to make Plaintiff successful, but it has been hard going over the 16 years Plaintiff has been in business.

23. Plaintiff has been exposed to any number of "soft-barriers" and adverse treatment; on information and belief, this was due to perceived imputed-race.

24. VDOT contracts are subject to inspections and oversight; on information and belief this inspection and oversight regime is much harsher where the primary contractor is black-owned. For instance, a VDOT inspector called the police on Plaintiff's employees because they were taking a break; on information and belief no VDOT inspector has ever called the police on a jobsite where white employees of a white-owned business were on break.

25. This goes along with more mundane heightened oversight and harsher treatment, which is certainly not something Plaintiff accepts—it is embarrassing and infuriating—but it is not worth bringing suit over.

26. Plaintiff, however, learned on or about November 4, 2024 that it had lost millions of dollars because of the selfsame prejudice.

**FACTS**

27. Plaintiff is a small to mid-size primary contractor. It has a fleet of work vehicles and heavy machinery (including multiple bulldozers, excavators, skid-steers, dump trucks, semi-trucks, and work trucks).

28. It is considered, and certified, to be qualified to act as a primary contractor on any number of VDOT projects, including the projects at issue in this complaint. In the simplest of terms Plaintiff is considered a "responsible" bidder and qualified as such.

29. There is no question that Plaintiff had the capacity, qualifications, and ability to carry out the projects at issue here, namely L48 and L58.

30. In and about late 2024, Plaintiff bid on two projects, L48 and L58.

31. In September 2024, Plaintiff bid $ 1,551,504.50 on L58 (on occasion the "Million-Dollar Project), the lowest bid, out of two bidders.

32. That bid exceeded the construction value of the project of $1,527,000.00 by 1.6%.

33. It was announced that the bid exceeded the "Engineers Estimate" for project L58.

34. This occurred on or about September 25, 2024.

35. On or about October 4, 2024, Plaintiff learned its bid was not approved and the contract was not awarded.

36. Plaintiff was the sole bidder on project L48 (on occasion the "Three-Million-Dollar Project") and bid $3,957,464.65. L48 had an estimated construction value of $3,157,000.00. It was announced—VDOT must announce bids and state whether or not the bid exceeded or was within its "Engineers Estimate"—that the bid was within the range of the Commonwealth's Engineers Estimate.

37. That announcement occurred on or about October 23, 2024; subsequently, VDOT, reneged and stated that it was over the Engineers Estimate.

38. Thereafter, Plaintiff learned that its bid had not been approved and that the contract would not be awarded, this occurred November 4, 2024.

39. Plaintiff began to investigate the rejections of its bids—although, winning bids are announced, one does not know the Engineers Estimates during the bidding process.

40. Plaintiff learned that the rejection of its bid was highly unusual when compared to similar bids, from similar businesses, on similar contracts.

41. VDOT regularly, during the same time frame, took bids well over the Commonwealth's Engineers Estimate and the construction value. Indeed, these bids on many occasions were well over 30% beyond construction value and exceeded the Engineers Estimate by significant amounts—Plaintiff is not speaking about "small" contracts where an overage of some thousands might result in a 30 percent overage, but contracts within the one-to-three-million-dollar range.

42. On information and belief, a project similar to the Three-Million-Dollar Project, was awarded to a substantially similar (though white-owned) business where that business bid 41% over construction value and 60% over the Engineers Estimate.

43. In the worst case, a project similar to the Three-Million-Dollar Project, was awarded to a substantially similar (though white-owned) business that bid over 211% above construction value.

44. Further, on information and belief, yet another project similar to the Three-Million-Dollar Project, was awarded to a substantially similar (though white-owned) business where that business bid 32% over construction value and 12% over the Engineers Estimate.

45. The list could go on, but would become repetitive, on tens of occasions VDOT awarded contracts which significantly exceeded the engineers estimate and the construction value where the bidding was in the three-million-dollar range.

46. Likewise, the same dynamic is present in the million-dollar range. More than 60 projects have been awarded where construction costs exceeded the construction value by 1.6%.

47. On information and belief, a project similar to the Million-Dollar Project, was awarded to a substantially similar (though white-owned) business where that business bid 40% over construction value and 58% over the Engineers Estimate.

48. On information and belief, yet another a project similar to the Million-Dollar Project, was awarded to a substantially similar (though white-owned) business where that business bid 27% over construction value and 62% over the Engineers Estimate.

49. On information and belief, a third project similar to the Million-Dollar Project, was awarded to a substantially similar (though white-owned) business where that business bid 25% over construction value and 239% over the Engineers Estimate.

50. Plaintiff only learned of the injury—the disparate treatment—or at least had reason to suspect it in or about, November 11, 2024. It was on this date that Plaintiff first learned of the bidding and award history of similar VDOT projects. Prior to this it was impossible for any person (without VDOT) to know the Engineers Estimates. Plaintiff only secured those documents on October 18, 2024, following a FOIA request.

51. Moreover, it was only after learning of the identity of the winning bidders on substantially similar contracts that Plaintiff learned that his business was substantially similar and those bids were substantially similar.

**COUNT I**

***Violation of Title VI (42 U.S.C. § 2000d)***

*Against all Defendants*

52. Plaintiff realleges and incorporates the allegations in paragraphs 1-51 as if set forth here.

53. The United States provides financial assistance to entities and projects with certain caveats and requirements, as is relevant to this Complaint, that includes an agreement not to exclude or

discriminate against any person who may benefit from a program or activity receiving federal funds on the basis of race.

54. On information and belief, VDOT in general receives significant federal funding and received funding, in particular, to finance projects L48 and L58. In other words, the Million-Dollar Project and Three-Million-Dollar Project ("referred to collectively as the "Projects") are programs or activities receiving federal financial assistance.

55. Defendants then utilize that federal funding to construct (through primary contractors such as Plaintiff) various infrastructure.

56. Plaintiff is a primary contractor who applies for and receives the federal funding through VDOT; while Plaintiff is not necessarily the most-benefitted party as a result of the outlay of federal funds, on projects such as Projects, Plaintiff certainly is a beneficiary and the nexus between the outlay of federal funds and the construction contracts on which Plaintiff bids is clear.

57. On October 23, 2024 and a subsequent date, it was announced that Plaintiff was the apparent low bidder on the Projects.

58. Despite that Plaintiff's low bids were rejected.

59. There was no legitimate nondiscriminatory reason for Defendants not to approve Plaintiff's bids on the Projects and award the Projects to Plaintiff.

60. On information and belief, the sole reason Defendants chose not to approve Plaintiff's bids on the Projects and not to award the Projects to Plaintiff was Plaintiff's perceived imputed race.

61. The primary contracting community is "small," and Mr. Lee and Plaintiff were well known in that community—including to agents, employees, and members of VDOT.

62. Mr. Lee attended countless conferences, events; everyone, within the VDOT-contracting community, knew Mr. Lee and everyone knew Mr. Lee owned Plaintiff.

63. In short, everyone within that community including Mr. Brich knew that Plaintiff was "minority owned." Likewise, they knew that Mr. Lee was the owner and Mr. Lee was black. Indeed, the business applied for and received special status because of Mr. Lee's race.

64. Plaintiff was otherwise fully qualified to take on the Projects and the bids made for the Projects were not only the lowest bids but attractive for those Projects.

65. Since that time the Projects have been rebid and still no bid lower than that Plaintiff's has been made.

66. Defendants routinely approve and award contracts for similar projects that are less attractive economically, and on all other legally acceptable considerations, than those that Plaintiff made for Project.

67. Plaintiff's business has a sterling record and is not less attractive than substantially similar white-owned businesses that have received similar contracts[3] with less attractive bids—the only factor which would make Plaintiff's business less attractive is the race of its ownership.

68. On information and belief Defendants discriminated against Plaintiff in denying its bids for the Projects and treated Plaintiff significantly worse than similarly situated corporate parties who were non-black-owned.

69. Plaintiff as a construction contractor is meant to be a beneficiary of the funds which VDOT receives from the federal government and a major purpose in providing those funds is to pay primary contractors to conduct projects such as Project.

70. Plaintiff was discriminated against and lost the benefit of those funds because of Defendants.

---

[3] Plaintiff falls within the small to mid-size within this market, there are few operators who bid on projects within the 1-3 million dollar range because they are not large enough to be attractive to large construction companies—they are simply not worth the time—and are not within the capabilities of most "small businesses." Those small businesses lack the heavy machinery and manpower necessary to take on such construction tasks. In order to compete in this segment of the market a business needs to have a somewhat significant amount of heavy machinery which small construction companies often lack the capital to invest in.

71. Plaintiff, as a direct and proximate result of the acts complained of herein has suffered damages and injury.

72. Plaintiff seeks damages and attorney's fees as a result.

WHEREFORE Plaintiff demands judgment against Defendants for the following:

A. General, compensatory, and consequential damages in an amount to be proven at trial;

B. Any other such damages as may be allowed under all the above federal and state laws;

C. Attorneys' fees and costs; and

D. Such other and further relief as the Court may deem just and appropriate.

***Respectfully Submitted, JIREH Construction Co., Inc.***
by counsel on: October 22, 2026,

**/S/ AMINA MATHENY-WILLARD**
Amina Matheny-Willard, Esquire, #43566

**AMINA MATHENY-WILLARD, PLLC**
WATERSIDE OFFICE
999 Waterside Drive, Suite 2525
Norfolk, Virginia 23510
Office: (757) 777-3441
Fax: (757) 282-7808
MONTICELLO OFFICE
440 Monticello Avenue, Suite 1800-1824
Norfolk, Virginia 23510
Office: (757) 955-8565
Fax: (757) 687-0702
Firm Text: (757) 204-5766
Email: amina@aminalaw.com
***Counsel for Plaintiff, JIREH / Construction Co., Inc.***